**Affirmed and Memorandum Opinion filed March 25, 2021.**



In The

# Fourteenth Court of Appeals

---

## NO. 14-19-00705-CV

---

## BRYAN EDWARD GRANTOM, Appellant

### V.

## SHERRI LYNN SWISHER, Appellee

**On Appeal from the County Court at Law**
**Waller County, Texas**
**Trial Court Cause No. 17-01-24131**

---

## MEMORANDUM OPINION

As part of their divorce proceedings, Sherri Lynn Swisher (formerly Grantom) ("Wife") and Bryan Edward Grantom ("Husband") signed a mediated settlement agreement that reserved three issues for resolution via trial. After a jury trial, the trial court signed a final decree of divorce and Husband appealed. *See* Tex. Gov't Code Ann. § 25.2392(a) (Waller County has concurrent jurisdiction with the district court in family law cases and proceedings). For the reasons below, we affirm.

BACKGROUND

Husband and Wife were married in January 1999. Wife filed a petition for divorce in January 2017 and Husband filed a counterpetition. The trial court signed an agreed temporary order approving the sale of the parties' marital home in Waller County, Texas. The home was sold and approximately $500,000 was placed in an escrow account. The trial court signed an "Agreed Order to Disburse Funds from Escrow Account" and Husband and Wife each received $100,000 to pay their divorce attorneys, leaving $306,855.21 in the escrow account.

The parties signed their first mediated settlement agreement in September 2018 (the "2018 MSA"), setting an agreed parenting plan for their two children. The parties signed a second mediated settlement agreement in April 2019, which approved certain mediation procedures and conditions.

In June 2019, the parties signed their third mediated settlement agreement (the "Property MSA"), which effected a partial settlement of their community estate. As relevant to our analyses below, the Property MSA made the following allocations:

Husband

- 50% of the funds held in escrow from the sale of the marital home. From this 50%, Husband would pay a lump sum of $13,875 to Wife representing a cash buy-out of her interest in the Capital Farm Credit account.[1]

Wife

- 50% of the funds held in escrow from the sale of the marital home.

- 100% of the funds held in Husband's attorney's IOLTA account, which arose out of the agreed sale of certain items of personal

---

[1] The Capital Farm Credit account is a loan taken out in 2001 and paid out over a 30-year period.

property and Capital Farm Credit disbursements. From this amount, $650 would be payable to Husband for Wife's healthcare premiums.

The Property MSA also included the following provisions:

G. It is AGREED that the following issues are carved out of the [Property MSA] and shall remain subject to a contested trial and further order of the Court:

1. Is Husband entitled to reimbursement of $42,308.54 on his claim that he supplied separate funds to the Community Estate to purchase the marital residence?[2]

2. How should liability and attorney's fees, if any, arising out of the "Janac Litigation" be allocated between the parties?

3. How should Husband's retirement interests arising out of his employment with the City of Houston Fire Department be allocated between the parties?

H. While the parties understand and AGREE to the division of their remaining assets, they AGREE that the allocation of these remaining assets may need to be adjusted by the Court in light of the Court's ultimate determination on the issues to be tried.

The "Janac Litigation" refers to a 2016 lawsuit against Waterland Kennels, a dog boarding and training facility owned by Husband and Wife.

The parties proceeded to a jury trial in June 2019. The jury heard testimony from two experts regarding the portion of Husband's Houston Firefighter Relief and Retirement Fund ("HFRRF") benefits that could be considered part of the community estate for purposes of a later division. At the time of trial, Husband was 52 years old and had spent 18 years working for the Houston Fire Department ("HFD"). The experts testified that Husband was eligible for the following HFRRF benefits:

---

[2] This issue was not decided by the trial court because the parties stipulated to the separate funds during trial.

- Because Husband had worked at least 10 years but less than 20 years with HFD, he could retire immediately and participate in the HFRRF deferred pension plan, under which Husband would receive a $2,179.10 monthly payment.

- Alternatively, Husband could receive a refund of contributions in the amount of $98,098.47.

- If Husband acquired 20 years of HFD employment, he would be entitled to receive a supplemental $150 monthly payment and a $5,000 lump sum payment.

- If Husband acquired 20 years of HFD employment, he would be entitled to participate in the HFRRF service pension plan instead of the deferred pension plan. The service pension plan would yield greater monthly payments than the deferred pension plan.

- If Husband acquired 20 years of HFD employment, he could participate in the Deferred Retirement Option Plan ("DROP"), which would allow him to accrue additional retirement funds in a separate account.

The jury determined the parties' community estate had a $2,179.10 interest in Husband's monthly HFRRF retirement payments, regardless of whether those payments were made pursuant to the deferred or the service pension plan. The jury also found the community estate had the following interests in the other HFRRF benefits: (1) a $98,098.47 interest in the refund of contributions; (2) a $135 interest in the supplemental $150 monthly payment; and (3) a $4,500 interest in the $5,000 lump sum payment. The jury concluded the community estate did not have an interest in the optional DROP plan.

After the jury returned its verdict, the trial court heard testimony and evidence regarding the division of the parties' community estate. An actuary testified as an expert with respect to the parties' social security benefits. Because Husband did not contribute to social security, he would not be entitled to receive a social security payment in addition to any HFRRF benefits he would receive.

4

Conversely, Wife had contributed to social security and would be entitled to the following retirement benefits: a $1,240 monthly payment if she retired at age 62 or a $1,855 payment if she retired at age 67. At the time of trial, Wife was 52 years old.

The trial court also heard testimony from Husband and Wife regarding their assets and their preferred distributions of the community estate.

The trial court signed a final decree of divorce on September 12, 2019 and issued findings of fact and conclusions of law. In relevant part, the trial court made the following findings as allocations:

Husband

- $42,308.54 from the escrow account as Husband's separate property.

- 100% of the future payments from the Capital Farm Credit account, totaling $29,751.28.

- 100% of Husband's future retirement benefits, including those from the HFRRF.

- With respect to the Janac litigation, 60% of (1) any settlement proceeds in favor of Husband, Wife, or Waterland Kennels, and (2) any judgment against Husband, Wife, or Waterland Kennels.

- Any and all legal expenses and fees incurred in the Janac litigation.

Wife

- 100% of the remaining funds in the escrow account, totaling $264,546.67.

- 100% of the funds held in Husband's attorney's IOLTA account, totaling $7,143.56.[3]

---

[3] The divorce decree conflicts with the findings of fact and conclusions of law with respect to the allocation of the IOLTA account. In the divorce decree, all of the IOLTA fund was allocated to Wife "save and except $650" to Husband. But in the findings of fact and conclusions of law, the trial court allocated 100% of the IOLTA account to Wife.

Findings of fact and conclusions of law filed after a judgment are controlling if they

5

- 100% of Wife's future retirement benefits.

- With respect to the Janac litigation, 40% of (1) any settlement proceeds in favor of Husband, Wife, or Waterland Kennels, and (2) any judgment against Husband, Wife, or Waterland Kennels.

Husband timely appealed.

## ANALYSIS

Husband raises four issues on appeal, but because his third and fourth issues have the same title and raise similar arguments, we list them as a single issue:

1. The trial court abused its discretion by "invading the mediated settlement agreement by redistributing assets resolved by [the] mediated settlement agreement."

2. The trial court abused its discretion "in failing to address [Husband's] requested relief on attorney's fees" incurred in the Janac Litigation.

3. The trial court abused its discretion by "failing to recogniz[e] the factors set out in *Murff* for determining the equitable interest of the parties in the HFRRF benefits of [Husband]."

We first outline the standard of review and governing law before turning to the issues Husband raises on appeal.

## I. Standard of Review and Governing Law

In dividing marital property upon divorce, the trial court must order a division in a manner the court deems just and right, having due regard for the rights of each party. Tex. Fam. Code Ann. § 7.001. "A just and right division need not be equal . . . but it must be equitable." *Cantu v. Cantu*, 556 S.W.3d 420, 427 (Tex. App.—Houston [14th Dist.] 2018, no pet.). In *Murff v. Murff*, 615

---

conflict with a previous judgment. *See* Tex. R. Civ. P. 299a; *see also In re R.J.P.*, 179 S.W.3d 181, 184 n.3 (Tex. App.—Houston [14th Dist.] 2005, no pet.); *Dickerson v. DeBarbieris*, 964 S.W.2d 680, 684 (Tex. App.—Houston [14th Dist.] 1998, no pet.). Therefore, the trial court's findings of fact and conclusions of law control, and Wife was allocated 100% of the IOLTA account.

S.W.2d 696 (Tex. 1981), the Texas Supreme Court listed the factors trial courts may consider in their division of a community estate:

1.  the spouses' capacities and abilities;
2.  benefits which the party not at fault would have derived from the continuation of the marriage;
3.  business opportunities;
4.  education of each spouse;
5.  relative physical conditions;
6.  relative financial condition and obligations;
7.  disparity of ages;
8.  size of separate estates;
9.  the nature of the property; and
10. disparities in earning capacities and income.

*Id*. at 699.

We presume the trial court's division is proper and "will correct the trial court's division of marital properly only when an abuse of discretion has been shown." *In re Marriage of O'Brien*, 436 S.W.3d 78, 82 (Tex. App.—Houston [14th Dist.] 2014, no pet.). To prevail on a complaint about the division of property, an appellant must demonstrate that the division was so manifestly unjust or unfair as to constitute an abuse of discretion. *Quijano v. Quijano*, 347 S.W.3d 345, 349 (Tex. App.—Houston [14th Dist.] 2011, no pet.). Assessments of the legal and factual sufficiency of the evidence are not independent grounds for reversal but are relevant factors in assessing whether the trial court abused its discretion. *Id*.

## II.     Prior Asset Allocation

In his first issue, Husband contends the trial court "lacked the authority to re-divide claims that were disposed of under the MSA." Specifically, Husband

challenges the trial court's decision to allocate 100% of the IOLTA account funds to Wife and argues that this disbursement conflicts with:

- the 2018 MSA's resolution of the $870.50 Husband owed to Wife "for [Husband's] pro rata share of unreimbursed health/medical expenses of the children"; and
- the Property MSA's allocation of $650 from the IOLTA account to Husband for Wife's insurance premiums.

Husband contends that the prior distributions of these assets control over the trial court's later attempt to alter their allocation.

We interpret mediated settlement agreements under the rules of contract interpretation. *Milner v. Milner*, 361 S.W.3d 615, 619 (Tex. 2012). If the agreement's language can be given a certain and definite meaning, the agreement is not ambiguous and its construction is a matter of law for the court. *Id*. When the agreement's terms are plain, definite, and unambiguous, the court cannot alter these terms. *In re Davenport*, 522 S.W.3d 452, 458 (Tex. 2017) (orig. proceeding).

We begin with Husband's argument regarding the $870.50 payment. The 2018 MSA addressed this payment as follows:

> The parties agree that [Husband] owes to [Wife] the sum of $870.50 as his pro rata share of unreimbursed health/medical expenses of the children to date. [Husband] shall pay this sum to [Wife] as part of the property division **to be addressed either in a subsequent Mediated Settlement Agreement or per trial**.

(emphasis added). Staying within this directive, the trial court addressed the $870.50 after trial and, in its findings of fact and conclusions of law, stated that the payment was included in the IOLTA and escrow funds allocated to Wife. Therefore, the trial court's allocation of the $870.50 did not impermissibly conflict with the 2018 MSA. We reject Husband's argument regarding the $870.50 payment.

Turning to the $650 payment, the parties' Property MSA provided as follows:

> Wife shall be awarded 100% of the funds held in [the IOLTA account] and arising out of the agreed sale of certain items of personal property and Capital Farm Credit disbursements, *less $650.00 payable to Husband for extra premiums for Wife's healthcare*.

(emphasis in original). But the Property MSA also contained the following provisions addressing actions the trial court could take in its ultimate division of the community estate:

> G.    It is AGREED that the following issues are carved out of the [Property MSA] and shall remain subject to a contested trial and further order of the Court:
>
> *       *       *
>
> H.    While the parties understand and AGREE to the division of their remaining assets, ***they AGREE that the allocation of these remaining assets may need to be adjusted by the Court in light of the Court's ultimate determination on the issues to be tried***.

(emphasis added). These provisions are plain, definite, and unambiguous; we discern their meaning as a matter of law. *See In re Davenport*, 522 S.W.3d at 458; *Milner*, 361 S.W.3d at 619. The Property MSA is clear that, although the parties "agree[d] to the division of the[] remaining assets" that were not reserved for trial, this division was subject to further adjustment by the trial court in light of its resolution of the issues to be tried. These provisions permit the action Husband challenges here, namely, the trial court's elimination of the $650 payment to Husband included in the Property MSA. We therefore reject Husband's argument regarding the $650 payment.

We overrule Husband's first issue.

9

## III.      Janac Litigation Expenses and Legal Fees

Asserting the trial court failed to address Husband's requested relief for attorney's fees stemming from the Janac litigation, Husband contends the trial court did not (1) determine the amount of attorney's fees proven, or (2) explain its reason for allocating 100% of those expenses to Husband.

In the divorce decree, the trial court assigned to Husband "[a]ny and all expenses [and] legal fees resulting from the Janac civil law suit." The trial court filed findings of fact and conclusions of law but did not make a finding or conclusion addressing the amount of these fees or its basis for assigning 100% of those fees to Husband.

After a trial court files its findings of fact and conclusions of law, a party may request specific additional or amended findings or conclusions within 10 days. Tex. R. Civ. P. 298. Here, Husband did not ask the trial court to make additional findings or conclusions addressing the amount of legal expenses in the Janac litigation or its reasons for assigning 100% of those fees to Husband. This failure to request amended or additional findings or conclusions waives the right to complain on appeal about the trial court's failure to make the omitted findings or conclusions. *See* Tex. R. App. P. 33.1(a)(1)(B); *see also Howe v. Howe*, 551 S.W.3d 236, 244, 253 (Tex. App.—El Paso 2018, no pet.); *Villalpando v. Villalpando*, 480 S.W.3d 801, 809-10 (Tex. App.—Houston [14th Dist.] 2015, no pet.). Therefore, we overrule Husband's challenge regarding the trial court's failure to (1) determine the amount of attorney's fees associated with the Janac litigation, or (2) explain its basis for allocating 100% of those fees to Husband.

To the extent Husband complains about the actual allocation of the Janac litigation expenses and legal fees, this allocation finds adequate support in the record.

Testifying at trial, Husband explained that he and Wife owned Waterland Kennels, which offered dog training and boarding. Robert Janac brought his dog to Waterland Kennels in December 2013 for training. Husband said Wife was responsible for feeding and training Janac's dog.

According to Husband, Janac was displeased with the services he received from Waterland Kennels and "put some defamatory comments on the internet." Husband said he and Wife discussed filing a lawsuit against Janac, and Wife contacted an attorney. Husband testified that he and Wife both met with this first attorney; at that time, Wife (who had previously worked as a paralegal) offered the attorney any assistance she could provide in the case. The first attorney filed suit against Janac in December 2015, with Husband named as plaintiff.

Janac filed a countersuit against Husband in February 2016. Husband's suit against Janac was dismissed in April 2016 and the first attorney withdrew from representation in October 2016. According to Husband, he then retained a second attorney to litigate the case. Husband said Wife neither signed the contract with the second attorney nor did she attend the meetings with him.

Husband again switched attorneys in the Janac litigation and retained a third attorney as counsel. Husband said he did not discuss the third attorney's retention with Wife and Wife did not sign the contract for that representation. According to Husband, Wife did not attend the meetings with the third attorney and Husband had not discussed with Wife any further legal representation in the Janac litigation. Husband testified that his last discussion with Wife regarding the Janac litigation occurred approximately two and a half years before trial. Husband said Wife did not attend any depositions or court hearings.

Husband said he had paid the second attorney $12,500 for representation in the Janac litigation but had "no idea" of the total amount in attorney's fees he had

incurred.

In her testimony, Wife said it was Husband's idea to file the lawsuit against Janac. Wife testified that she "agreed" to the suit but had some concerns about its likelihood for success. According to Wife, she met with the first attorney only once — when he was retained to file suit against Janac. Wife said neither the second nor third attorneys contacted her about the Janac litigation.

According to Wife, she encouraged Husband to "drop" the lawsuit when "it started going downhill." Wife said that, at the time of trial, she no longer had any role in the Janac litigation.

Based on this testimony, the trial court did not abuse its discretion by allocating to Husband 100% of the legal expenses and fees incurred in the Janac litigation even though the expenses and fees were community debt.

We overrule Husband's second issue.

## IV.     HFRRF Allocation

In his third and fourth issues, Husband appears to challenge the trial court's allocation of his HFRRF benefits. Husband asserts that the trial court's divorce decree "should be reversed and remanded for an equitable division of the HFRRF benefits."

As we discussed above, however, the trial court allocated to Husband 100% of his retirement benefits, including those he would be entitled to receive from the HFRRF. It is unclear what challenge Husband is raising with respect to this allocation or what kind of allocation Husband asserts would have been proper.

To the extent these issues broadly challenge the trial court's overall division of the community estate, this division finds adequate support in the record.

The trial court allocated $72,059.82 in cash to Husband, which included (1) $42,308.54 from the escrow account as his separate property, and (2) $29,751.28 in future payments from the Capital Farm Credit account. The trial court allocated to Wife $271,690.23 in cash, which included (1) $264,546.67 from the escrow account, and (2) $7,143.56 from the IOLTA account.

Although Wife received approximately $200,000 more in cash than Husband, this disparity is mitigated by the trial court's allocation of the parties' retirement benefits. The trial court allocated to Husband 100% of his HFRRF benefits. The evidence at trial showed that, if Husband retired immediately, he would be entitled to receive a $2,179.10 monthly payment under the HFRRF deferred pension plan.

If Husband worked for two more years at the HFD and retired after 20 years of employment, his retirement benefits would increase substantially and would include (1) an increased monthly payment under the service pension plan; (2) a supplemental $150 monthly payment; (3) a $5,000 lump sum payment, and (4) the option to participate in the DROP program.

Conversely, the evidence at trial showed that Wife's retirement benefits were significantly more modest than Husband's. At the time of trial, Wife was not eligible for social security retirement benefits for approximately 10 years, when she would be 62 years old. When she turned 62, Wife would be entitled to a $1,240 monthly payment from social security; this amount would increase to $1,855 if she retired at age 67. This evidence shows that, when Wife would be eligible for retirement in ten years at age 62, Husband could have received $261,492 in retirement benefits under the HFRRF deferred pension plan; if Husband extended his HFD employment to 20 years or beyond, his benefits would far exceed what Wife would be entitled to under social security.

13

Considered together, the evidence does not show that the trial court's division of the community estate constitutes an abuse of discretion.

We overrule Husband's third and fourth issues.

**CONCLUSION**

We affirm the trial court's September 12, 2019 final decree of divorce.


/s/    Meagan Hassan
Justice


Panel consists of Justices Spain, Hassan, and Poissant.